# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| ST ENGINEERING MARINE, LTD., | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **2:20-cv-00327-JDL** |
| | ) | |
| THOMPSON, MACCOLL & BASS, LLC, | ) | |
| | ) | |
| **Defendant.** | ) | |

## AMENDED DECISION AND JUDGMENT

Plaintiff ST Engineering Marine, Ltd. ("STEM") asserts a claim (ECF No. 1) for legal malpractice under Maine law against Defendant Thompson, MacColl & Bass, LLC ("TM&B"). A three-day bench trial was completed on March 30, 2022. The primary disputes between the parties are: (1) whether TM&B breached the applicable standard of care when it advised STEM in connection with a possible maritime lien asserted by a third party against a vessel owned by STEM; (2) if the advice that TM&B gave was erroneous, whether (a) STEM had the burden to show that the third party would not have been able to prove a maritime lien or (b) TM&B had the burden to show that the third party would have been able to prove a maritime lien; and (3) what the trial evidence revealed about whether the third party would have been able to prove the asserted maritime lien.[1]

---

[1] A maritime lien is "[a] lien on a vessel, given to secure the claim of a creditor who provided maritime services to the vessel or who suffered an injury from the vessel's use." *Lien*, Black's Law Dictionary (11th ed. 2019).

After hearing the testimony and carefully reviewing the parties' post-trial submissions (ECF Nos. 67, 68), I make the following findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52(a). I first address the standards for breach of duty in a professional setting under Maine law. Finding that TM&B breached its professional duty to STEM when it provided erroneous legal advice, I then determine that STEM, as the plaintiff in a professional negligence action, held the burden of proving at trial that TM&B's negligent advice was the proximate cause of its injury. Based on the record evidence, I conclude that it is more likely than not that STEM would have prevailed in challenging the third-party lien claim, but-for TM&B's advice.

## I.  FINDINGS OF FACT

STEM is involved in shipbuilding, among other industries. After a shipbuilding contract was terminated by a prospective purchaser, STEM unexpectedly found itself as the owner of the *M/V Nova Star*. Although STEM was not in the business of owning and operating ships, it was able to lease the *M/V Nova Star* to Nova Star Cruises Ltd. ("Nova Star Cruises") in December 2013. Nova Star Cruises used the vessel to operate a ferry service. In addition to the lease agreement, STEM held a ten percent ownership share in NOVA Star Cruises. The lease agreement between STEM and Nova Star Cruises was a "bareboat" charter, meaning that Nova Star Cruises, not STEM, was responsible for all aspects of the vessel's operations and the associated expenses, including the cost of fuel.

While the *M/V Nova Star* was bareboat chartered to Nova Star Cruises, it was arrested in Portland, Maine, on October 31, 2015, by Portland Pilots, Inc., which

asserted a maritime lien on the vessel for pilotage services.  Following the arrest, other entities came forward to assert additional maritime-lien claims on the vessel. STEM, as the owner of the vessel, sought legal advice from TM&B in connection with the vessel's arrest and specifically inquired as to whether each of the asserted claims would in fact support a maritime lien.

One of the asserted maritime-lien claims was from Sprague Operating Resources, LLC ("Sprague") for fuel that it had supplied to the *M/V Nova Star*.  The orders for this fuel had originated with Fleetpro Ocean Inc. ("Fleetpro"), a ship-management company that Nova Star Cruises had engaged to operate the *M/V Nova Star*.  Bunkers International Corporation ("BIC")—a company that arranged fuel deliveries for charterers at different ports—had served as an intermediary between Fleetpro and Sprague.  Fleetpro paid BIC for the fuel that Sprague had delivered, but BIC filed for bankruptcy and failed to pay Sprague.  In Sprague's motion to intervene in the arrest proceeding, Sprague filed a proposed complaint alleging, on information and belief, that BIC had authority to procure necessaries for and establish liens on the *M/V Nova Star*, and that BIC was an agent for the benefit of the vessel.

An attorney from TM&B advised STEM in November 2015 that Sprague's maritime-lien claim was valid.  The basis for this advice was the attorney's belief that, under First Circuit law, the direct supplier of fuel had a lien on the vessel if the fuel (1) was delivered and (2) had been ordered by someone with authority to do so, no matter how many intermediaries there were between the authorized person and the direct supplier.  Sprague had supplied fuel to the vessel on June 12, 2015, and

again on July 2, 2015, and was seeking $298,073.  On TM&B's advice, STEM settled Sprague's claim for $267,366 and filed a claim in the BIC bankruptcy proceeding for the same amount.  STEM was paid $5,526.96 from the bankruptcy claim.  In the bankruptcy proceeding, STEM alleged that, in exchange for fuel, it had made two payments to BIC in the amounts of $156,460.73 and $157,729.23, each of which BIC wrongfully retained instead of paying Sprague.

Sprague had sent invoices to BIC for $147,354.92 and $149,719.28 for the two deliveries.  In turn, BIC sent invoices addressed to Nova Star Cruises "and/or Master, Owners, Operators, Charterers, Managers, Managing Agents" for $156,460.73 and $157,729.23.  Exhibit 18 at 1, 9.  The associated purchase orders prepared by Fleetpro list Fleetpro "AS AGENTS FOR" Nova Star Cruises and BIC as the "Supplier." Exhibit 18 at 5, 11.  The purchase orders also specify that BIC needed to communicate with the local shipping agent of the vessel, Inchcape Shipping Services ("Inchcape"), to coordinate the delivery to the vessel's master.  The master and chief engineer of the *M/V Nova Star* stamped or signed Sprague's delivery receipts.

STEM's expert witness Frank DeGiulio, an experienced maritime lawyer, testified that BIC was a "one-stop shop[]" that allowed shipowners and charterers to arrange for fuel at any location in the world.  ECF No. 60 at 15:12-18.  He explained that, when a company like BIC delivers fuel, typically a barge carrying the fuel arrives at the vessel, there is a conversation or communication between the supplier and the chief engineer, the fuel is transferred, and the chief engineer signs the paperwork.  The TM&B attorney who advised STEM similarly testified that

businesses like BIC operate as "one-stop shop[s]" that deliver fuel to a given port within two or three days of a request.

Regarding the documentary evidence, DeGiulio concluded that Fleetpro—as the agent for Nova Star Cruises—contracted with BIC; BIC subcontracted out the order to Sprague; and neither Nova Star Cruises nor Fleetpro controlled the selection or performance of Sprague. DeGiulio cited that the purchase orders expressly refer to Fleetpro as an "AGENT[]" for Nova Star Cruises, expressly refer to BIC as the "Supplier," and do not mention Sprague. He also cited the fact that BIC charged Nova Star Cruises more for the fuel than Sprague charged BIC. He interpreted the fact that BIC billed Nova Star Cruises directly to mean that a contractual relationship existed between them that had been facilitated by Fleetpro as Nova Star Cruise's agent. Finally, DeGiulio testified that the signatures and stamps from the master and chief engineer on the fuel receipts reflect nothing beyond the fact that the vessel received the fuel from Sprague.[2]

Based on the testimony and the documentary evidence received in evidence, I find that STEM was not involved with the day-to-day operations of the *M/V Nova Star* because the lease between STEM and Nova Star Cruises was a bareboat charter. Nova Star Cruises contracted via its agent Fleetpro with BIC for the delivery of fuel to the vessel. BIC then contracted with Sprague for the same. STEM, Nova Star Cruises, and Fleetpro did not control the selection or performance of Sprague, nor did

---

[2] TM&B's expert witness, U. Charles Remmel, another experienced maritime attorney, did not testify as to the significance of these items of documentary evidence.

they have other dealings with Sprague apart from the routine acceptance of the delivery.

## II. CONCLUSIONS OF LAW

"[T]o prove attorney malpractice, a plaintiff must show (1) a breach by the defendant of the duty owed to the plaintiff to conform to a certain standard of conduct; and (2) that the breach of that duty proximately caused an injury or loss to the plaintiff." *Reppucci v. Nadeau*, 2020 ME 114, ¶ 7, 238 A.3d 994 (quoting *Brooks v. Lemieux*, 2017 ME 55, ¶ 9, 157 A.3d 798). I address whether TM&B breached its duty to STEM, and then I address proximate causation.

### A.    Breach of Duty

The Maritime Lien Act provides that "a person providing necessaries to a vessel on the order of the owner or a person authorized by the owner . . . has a maritime lien on the vessel." 46 U.S.C.A. § 31342(a) (West 2022). Fuel is a necessary. *ING Bank N.V. v. M/V Temara*, 892 F.3d 511, 515 (2d Cir. 2018). When analyzing a maritime-lien claim, certain persons are presumed to have the authority to order necessaries for a vessel, including the owner, the master, a person entrusted with the management of the vessel at the port of supply, and an "agent" appointed by the owner or charterer. 46 U.S.C.A. § 31341(a) (West 2022).

When TM&B advised STEM in November 2015 that Sprague had a maritime lien, the most recent First Circuit case analyzing the Maritime Lien Act was *Cianbro Corp. v. George H. Dean, Inc.*, 596 F.3d 10 (1st Cir. 2010). In *Cianbro*, the court rejected lien claims against two vessels filed by a company that was hired to provide

6

steel that was cut to certain specifications. *Id.* at 13-14. The company asserting the liens was a subcontractor to a subcontractor. *Id.* at 12-13. One of the reasons that the lien claims were rejected was that the evidence showed that the steel company had acted on the orders of the subcontractor who hired it, not the vessels' owners or any person authorized by the owners. *Id.* at 16-18.

In *Cianbro*, the First Circuit also acknowledged the "so-called 'principal/agent or middleman' line of cases, which creates a minimal exception to these rules" that reserve maritime liens for contractors who were directly ordered to provide necessaries by persons with authority. *Id.* at 17. The court characterized this middleman line of cases as holding that a subcontractor who was not directly ordered to provide necessaries can assert a lien if "it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance." *Id.* (quoting *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 229 (5th Cir. 1999)). The middleman exception did not benefit the steel company seeking to establish the lien in *Cianbro* because there was no evidence supporting the same. *Id.* at 17-18.

Twenty-three years before *Cianbro*, the First Circuit decided *Tramp Oil & Marine, Ltd. v. M/V Mermaid I*, 805 F.2d 42 (1st Cir. 1986), which is another case that analyzed the Maritime Lien Act. In *Tramp Oil*, the vessel's master ordered fuel, that request traveled through a chain of intermediaries, and the fuel was provided to the vessel by direct suppliers. *Id.* at 44. One of those intermediaries failed to fully pay another intermediary, a fuel broker. *Id.* The fuel broker argued that it had

acquired the direct suppliers' lien rights by paying one of the direct suppliers to supply the fuel, because the payment to the supplier was effectively an advance of money to the vessel.  *Id.* at 45.  The court rejected that theory because one of the requirements for an advance was lacking; however, the court observed that "[n]o one disputes that. . . [the] direct suppliers of the fuel to the [vessel] would be entitled to a maritime lien."  *Id.* at 44.  Further, when the court rejected the broker's argument that the direct suppliers' lien had been transferred to it under equitable principles, the court reasoned that such a remedy was unnecessary in part because "[b]rokers . . . already have the means to protect their interests . . . by securing an assignment of the suppliers' lien."  *Id.* at 46.

STEM relies on *Cianbro*, the First Circuit's 2010 decision, to argue that TM&B should have advised STEM that Sprague did not have a maritime lien because a lien existed only if (1) Sprague provided the fuel on the direct order of a person authorized to procure necessaries for the vessel or (2) a person authorized to procure necessaries for the vessel directed Sprague's selection and performance, i.e., the so-called middleman exception.  STEM asserts that the suggestion in *Tramp Oil* that direct suppliers necessarily having liens is dicta and, in any event, was superseded by *Cianbro's* more recent examination of the issue.

STEM also contends that after TM&B advised STEM in November 2015, there was a wave of court decisions—arising out of the collapse of a major fuel supplier and competing maritime-lien claims involving the provision of fuel—that embraced STEM's interpretation of maritime-lien law.  *See, e.g., Barcliff, LLC v. M/V Deep*

*Blue*, 876 F.3d 1063, 1068-73 (11th Cir. 2017); *ING Bank*, 892 F.3d at 519-21; *Valero Mktg. & Supply Co. v. M/V Almi Sun*, 893 F.3d 290, 294-95 (5th Cir. 2018); *Bunker Holdings Ltd. v. Yang Ming Liberia Corp.*, 906 F.3d 843, 845-47 (9th Cir. 2018). Although these decisions postdate TM&B's advice, STEM asserts that TM&B should have known that widely publicized litigation associated with a fuel supplier's financial collapse was in progress, thus calling into question whether maritime-lien rights could be asserted by "contracting" suppliers like BIC or by direct suppliers like Sprague.

TM&B counters that its advice was faithful to *Tramp Oil*, the First Circuit's 1986 decision, which the firm argues stands for the proposition that a direct supplier of fuel always has a maritime lien (1) if the fuel was delivered and (2) the order originated from a person with authority to establish a maritime lien on the vessel, even if there was no direct order from a person with authority to the direct supplier. According to TM&B, *Cianbro* did not control whether Sprague had a valid lien claim because *Cianbro* was a "subcontractor" case, whereas Sprague's lien claim was governed by the middleman line of cases, of which *Tramp Oil* is a prime example. TM&B argues that, under the middleman cases, the direct supplier has the lien regardless of how many intermediaries existed in the chain between the originating order and the direct supplier so long as the necessary was delivered and the order originated from an authorized person.[3]

---

[3] In its arguments TM&B sometimes treats the underlying Magistrate Judge's decision in *Cianbro* as amplifying or explaining the resulting decision by the First Circuit's decision in that case. *See Cianbro Corp. v. George H. Dean, Inc.*, Civ. No. 2:08-CV-128-H, 2009 WL 485094, at *8-10 (D. Me. Feb. 25, 2009). I do not, however, rely on the Magistrate Judge's decision to construe the First Circuit's

The TM&B attorney who advised STEM that Sprague had a valid lien testified that he thought the following considerations differentiate subcontractor and middleman fact patterns: (1) whether the person with authority to order a necessary expected the entity directly receiving the order to pass the order along to a third party and (2) whether the necessary would ultimately be furnished by a single provider. The provision of fuel falls under the middleman line of cases, he asserted, because of the nature of the service:  A party ordering fuel from a broker is certain that the broker will not be pumping it into the ship's tank, and it is expected that a single provider at the end of the transactional chain will deliver all the fuel being ordered. Thus, the TM&B attorney concluded that Sprague had a maritime lien because the fuel was delivered by Sprague and the order had originated with Fleetpro, an agent of the charterer.  However, TM&B's expert witness U. Charles Remmel, an experienced maritime attorney, articulated a different set of considerations distinguishing subcontractor and middleman cases; namely, whether an order for especially basic supplies such as fuel had been set in motion by an authorized person and whether the vessel had any involvement in the hiring of the entities further down the chain.  Regarding the other litigation cited by STEM involving the collapsed fuel supplier, TM&B argues that, at the point in time when TM&B advised STEM that Sprague had a valid lien claim, no court had rendered a decision addressing the competing claims of direct and contractual suppliers of fuel.

---

explanation of the middleman line of cases because the First Circuit's analysis represents the law of the case and is precedential.  *See Cianbro*, 596 F.3d at 17.

STEM has the better argument about the state of First Circuit law in November 2015. TM&B's interpretation of the middleman cases does not account for *Cianbro*'s analysis of the issue. In *Cianbro*, the court explicitly raised and rejected the possibility that the steel company had a maritime lien pursuant to the middleman line of cases, which the court characterized as "a minimal exception" to the general rule that a subcontractor cannot assert a lien for a necessary when a person with authority directly ordered the contractor to provide the necessary. 596 F.3d at 17. Quoting from the Fifth Circuit's decision in *Lake Charles Stevedores*, *Cianbro* described the ordinary rule that only a general contractor may assert a maritime lien for services provided to a vessel by subcontractors: "[S]ubcontractors [cannot] assert a lien on their own behalf, 'unless it can be shown that an entity authorized to bind the ship controlled the selection of the subcontractor and/or its performance.'" *Id.* (quoting *Lake Charles Stevedores*, 199 F.3d at 229). In defining the middleman exception, the Court's decision did not suggest that it is proper to inquire as to whether the necessaries were expected to be delivered by a single direct supplier, whether the original order was set in motion by an authorized party, or whether the necessary is especially basic to the ship. Further, although *Cianbro* did not concern the delivery of fuel, the decision construed the language of the Maritime Lien Act that applies to all lien claims: "providing necessaries to a vessel on the order of the owner or a person authorized by the owner." 46 U.S.C.A. § 31342(a). In 2015, the *Cianbro* decision's analysis of the law was the most recent expression of the principles

governing maritime liens for necessaries in the First Circuit and thus had to be considered to assess whether Sprague had a lien.

"Professional negligence, in the context of a legal malpractice action, is the failure to use such skill, prudence and diligence as is reasonable according to the standards of ordinarily competent lawyers performing similar services under like conditions." *Pawlendzio v. Haddow*, 2016 ME 144, ¶ 11, 148 A.3d 713. Consistent with the testimony of STEM's expert witness, DeGiulio, TM&B was negligent and, therefore, breached its professional duty when it advised STEM that Sprague had a maritime lien based on TM&B's erroneous belief that, under the middleman line of cases, a direct supplier of fuel has a maritime lien whenever the originating order came from a person authorized to establish a lien on the vessel and the fuel was delivered. That advice was contrary to the controlling case law of the First Circuit in November 2015 because it failed to accurately account for the *Cianbro* decision.

As a result of the TM&B attorney's interpretation of the most relevant case law, he incorrectly concluded that no additional analysis was necessary after he determined that the fuel was delivered and Sprague was the direct supplier. Instead of further factual inquiry to support his advice to STEM, he relied predominantly on the conclusory allegations made by Sprague in its pleading filed in the arrest proceeding initiated by Portland Pilots, Inc., and did not review the various records associated with the transactions that were relevant to determining whether BIC was an agent or authorized person. The attorney testified that he believed that Sprague's lien claim "squarely fit" into the middleman line of cases, yet he did not personally

seek out evidence as to whether STEM or Fleetpro "had control over the selection or performance of Sprague." ECF No. 60 at 157:10; ECF No. 61 at 21:7-8. Based on this belief, he did not conduct legal research beyond *Tramp Oil*, nor did he reread any of the cases cited to or relied on in *Cianbro*—a case that he knew was the most recent First Circuit decision addressing the contours of maritime liens—to determine whether its holding called into question his reliance on the much older decision in *Tramp Oil*. Thus, I conclude that TM&B's erroneous interpretation of the controlling law at the time and its resulting failure to exercise due diligence in investigating Sprague's lien claim, including the extent to which an authorized entity controlled the selection and performance of Sprague as a direct supplier, constituted a breach of the professional duty TM&B owed to STEM.

In concluding that TM&B breached the duty it owed to STEM, I do not credit STEM's additional argument regarding the publicity of ongoing litigation in 2015 arising out of the collapse of a major fuel supplier. The only published judicial decision that STEM identifies as having been issued before November 2015 in any of those cases was *UPT Pool Ltd. v. Dynamic Oil Trading (Singapore) PTE. Ltd.*, No. 14-CV-9262, 2015 WL 4005527 (S.D.N.Y. July 1, 2015). In that decision, the court did not address the substantive question of whether contractual or direct suppliers were entitled to maritime liens for fuel provided to vessels. *See id.* The court only reached the issue of whether it could exercise subject-matter jurisdiction over interpleader actions involving competing maritime-lien claims in a bankruptcy proceeding. *Id.* at *3, 10. Even if *UPT Pool* had addressed the merits of who held

lien rights between contracting and direct suppliers before November 2015, it would be *Cianbro*—not *UPT Pool*—that should have informed whether TM&B's advice to STEM was negligent in the First Circuit.

## B.    Proof of Causation

### 1.  Burden of Proof

"[I]n a legal malpractice case, once a plaintiff demonstrates that the defendant attorney was negligent, the plaintiff must show that that negligence actually and proximately caused his or her injury." *Wheeler v. White*, 1998 ME 137, ¶ 8, 714 A.2d 125. "In order to satisfy the proximate cause prong of [the legal-malpractice] test, 'a plaintiff must demonstrate that he or she would have achieved a more favorable result but for the defendant's alleged legal malpractice.'" *Reppucci*, 2020 ME 114, ¶ 7, 238 A.3d 994 (quoting *Niehoff v. Shankman & Assocs. Legal Ctr., P.A.*, 2000 ME 214, ¶ 9, 763 A.2d 121). "Without such proof, the existence of a causal connection between the negligent conduct and any damages is speculative or conjectural, and cannot support a judgment favorable to the plaintiff." *Id.* "[T]he plaintiff typically proves that the attorney's professional negligence caused injury to the plaintiff by presenting evidence of what would have happened in the underlying action had the attorney not been negligent." *Id.* ¶ 14 (quoting *Brooks*, 2017 ME 55, ¶ 18, 157 A.3d 798). "This traditional method of presenting the merits of the underlying action is often called the 'case-within-a-case.'" *Id.* (quoting *Brooks*, 2017 ME 55, ¶ 18, 157 A.3d 798). In effect, "the plaintiff has the burden of proving two cases in one lawsuit." 4 Ronald E. Mallen, *Legal Malpractice* § 37:94 (2022).

Here, the underlying action was the arrest proceeding in which Sprague asserted a maritime-lien claim on the *M/V Nova Star*. The baseline from which a more favorable result must be measured is STEM's $267,366 settlement payment to Sprague minus the $5,526.96 that STEM received from the BIC bankruptcy proceeding. *See Reppucci*, 2020 ME 114, ¶ 15, 238 A.3d 994. STEM argues that TM&B's negligent advice harmed it because Sprague did not have a valid lien and thus was not entitled to any payment from STEM.

STEM acknowledges that it bears the burden of proof to prove the case-within-the-case (i.e., that it would have reached a better outcome on Sprague's lien claim); nonetheless, it contends that TM&B bears the burden to prove that Sprague did not have a maritime lien because it was Sprague's burden in the arrest proceeding to prove the lien as an intervenor-plaintiff, and TM&B has stepped into Sprague's shoes. Thus, STEM contends that it did not have an obligation under the proximate-cause element of its professional negligence claim to prove that Sprague would not have had a maritime lien under the correct interpretation of maritime-lien law. For support, STEM cites *Glidden v. Terranova*, 427 N.E.2d 1169, 1171 (Mass. App. Ct. 1981).

In *Glidden*, the Massachusetts Appeals Court concluded that, when a former client brings a legal malpractice action against an attorney for negligently failing to defend a client in a prior action, the burden falls on the attorney to prove that the client had no defense. *Id.* at 1171. But *Glidden*—which involved a total failure to defend that resulted in a default judgment, *id.*—appears to represent the minority

viewpoint.  *See* Mallen, *supra*, § 37:97 (noting that only "[a] few courts have shifted the burden of proof to the attorney to establish that his or her negligence did not cause damage" and mentioning *Glidden*); *Sherry v. Diercks*, 628 P.2d 1336, 1339 (Wash. Ct. App. 1981) ("The client argues, in effect, that once he showed that the attorney did not defend the client, the burden of proof should shift to the attorney to justify the entry of the default judgment.  That is not the law of this state."); *Williams v. Barber*, 765 P.2d 887, 890 (Utah 1988) (citing *Glidden* and stating "we do not desire to follow that jurisdiction's lead").

And as a minority viewpoint, *Glidden* does not control how burdens of proof are allocated in professional negligence actions under Maine law.  Indeed, the Law Court has taken the opposite approach: The "evidence must be sufficient to establish [the] elements of professional negligence, particularly causation and damages, arising from [an] attorney's claimed failure to properly defend [a] plaintiff."  *Fleming v. Gardner*, 658 A.2d 1074, 1077 (Me. 1995) (citing *Burton v. Merrill*, 612 A.2d 862, 865 (Me. 1992)).  The Law Court cited that rule when concluding that a former criminal defendant needed to prove that his former lawyer's negligent representation caused his incarceration, even though it was the state's obligation in the underlying case to prove guilt beyond a reasonable doubt.  *Id.*; *see also Butler v. Mooers*, 2001 ME 56, ¶ 9, 771 A.2d 1034 (again allocating the burden of proof to show proximate causation to a former criminal defendant); *Fisherman's Wharf Assocs. II v. Verrill & Dana*, 645 A.2d 1133, 1336 (Me. 1994) ("In an action alleging professional negligence, the plaintiff must establish that the defendant had a duty to the plaintiff to conform

16

to a certain standard of conduct and that a breach of that duty proximately caused injury to the plaintiff."); *Brewer v. Hagemann*, 2001 ME 27, ¶ 7, 771 A.2d 1030 ("[T]his case does not require us to consider departing from the standard elements that every legal malpractice plaintiff must prove . . . one of those elements is causation; that is, proof that the plaintiff's damages were proximately caused by the defendant attorney's negligence.").

Accordingly, it was STEM's burden at trial to prove that Sprague did not have a valid maritime-lien claim and that, as a result, STEM was harmed by TM&B's advice. If STEM failed to demonstrate that Sprague did not have a maritime lien, then, at worst, TM&B committed "'malpractice in a vacuum,' since no damages could possibly flow therefrom." *Schneider v. Richardson*, 411 A.2d 656, 658 (Me. 1979).

### 2. Whether STEM Proved at Trial That Sprague Did Not Have a Maritime Lien

STEM argues that the trial evidence shows that Sprague would not have been able to prove a maritime lien on the *M/V Nova Star* under the test articulated by *Cianbro* and thus judgment on Sprague's claim in the arrest proceeding would have been entered in favor of the vessel. TM&B counters that STEM failed to prove that BIC was not an agent of STEM, Nova Star Cruises, or Fleetpro. If BIC had been an agent of the charterer or owner, then Sprague would have a valid maritime lien on the *M/V Nova Star* because Sprague provided the fuel to the vessel on direct orders from BIC. *See* 46 U.S.C.A. § 31341(a); *Cianbro*, 596 F.3d at 16-17.

Courts have looked to common law principles of agency "to interpret the [Maritime Lien] Act's references to agents." *Marine Fuel Supply & Towing, Inc. v.*

*M/V Ken Lucky*, 869 F.2d 473, 477 (9th Cir. 1988); *see, e.g.*, *Sing Fuels Pte Ltd. v. M/V Lila Shanghai*, 39 F.4th 263, 275 (4th Cir. 2022); *Lake Charles Stevedores*, 199 F.3d at 228; *Cianbro Corp. v. George H. Dean, Inc.*, Civ. No. 2:08-CV-128-H, 2009 WL 485094, at *7-8 (D. Me. Feb. 25, 2009).[4]  When courts apply principles of agency to maritime law, they "prefer generally applicable common law doctrines rather than particular state law because this promotes the uniformity of the general maritime law."  1 Thomas J. Schoenbaum, *Admiralty & Mar. Law* § 4:4 (6th ed. 2021).  "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act."  Restatement (Third) of Agency § 1.01 (Am. L. Inst. 2022).

Here, there was no evidence presented that STEM, Nova Star Cruises, or Fleetpro manifested assent that BIC act on their behalf and under their control.  To the contrary, STEM entered into a bareboat charter agreement with Nova Star Cruises and did not have any involvement in the operation of the vessel.  Thus, STEM was not involved in purchasing fuel through BIC, and BIC was not its agent.  And Nova Star Cruises contracted with BIC through Fleetpro, which was acting as Nova Star Cruise's agent.  The trial evidence indicates that the relationship between Nova Star Cruises and BIC was a nonagency contractual relationship, not an agency

---

[4] *See also Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1235 (11th Cir. 2014) ("[T]he Supreme Court and all of the federal circuits have for many years generally applied agency rules across a rich array of maritime cases."); *Garanti Finansal Kiralama A.S. v. Aqua Marine & Trading Inc.*, 697 F.3d 59, 71 (2d Cir. 2012) ("Federal maritime law, which is the law we apply in an admiralty case, embraces the principles of agency . . . ." (quoting *Kirno Hill Corp. v. Holt*, 618 F.2d 982, 985 (2d Cir. 1980))); *Cactus Pipe & Supply Co. v. M/V Montmartre*, 756 F.2d 1103, 1111 (5th Cir. 1985) ("Maritime law embraces the principles of agency.").

relationship in which BIC acted as a fiduciary. In particular, the evidence shows that BIC was a one-stop shop that would procure fuel for charterers like Nova Star Cruises by subcontracting out the order. Sprague charged BIC $297,065.20 for the fuel, and then BIC charged Nova Star Cruises $314,189.96, a $17,124.76 markup for its services. The markup in price indicates that BIC set the price and then contracted with Sprague, as a subcontractor, in order to make a profit. Finally, Fleetpro's purchase orders described itself and Inchcape as "agents" of Nova Star Cruises and described BIC as the "supplier," which evidences these parties' own understanding of their roles in the transaction.

TM&B argues, however, that additional evidence supports the inference of an agency relationship. TM&B first cites to the allegation in Sprague's proposed complaint that BIC was authorized to establish liens on the vessel. However, because that bare legal conclusion—set forth in Sprague's proposed complaint—was made on information and belief, I afford it little weight. Additionally, this legal conclusion was offered after-the-fact, in the context of the litigation initiated in November 2015. In contrast, the purchase orders and invoices describing Inchcape and Fleetpro as "agents" and BIC as their "supplier" were business records prepared in the ordinary course of those parties' business dealings.

TM&B also cites to the statement from STEM's claim in the BIC bankruptcy proceeding that STEM paid BIC directly for the two outstanding fuel invoices and that BIC wrongfully held onto the funds instead of paying Sprague. STEM's assertion in the bankruptcy claim that STEM paid BIC directly was an error (FleetPro paid

BIC), as STEM was not involved in the operation of the *M/V Nova Star* and thus had no role in paying BIC, which was instead the responsibility of Nova Star Cruises. Further, the allegation that BIC should have used the payment from Fleetpro to pay Sprague is not especially probative of whether any of the relevant entities manifested assent that BIC operate on their behalf and under their control. TM&B also cites to the first version of STEM's claim filed in the bankruptcy proceeding, which alleged incorrect dollar amounts for the payments made by STEM to BIC and also alleged that BIC was meant to pay Sprague on STEM's "behalf." Exhibit 74 at 2. When STEM filed an amended claim to include the correct amount of the payments it had paid to BIC, it omitted the allegation that BIC had operated on behalf of STEM. I therefore afford little weight to the allegation made in STEM's original submission in the Bankruptcy Court.

TM&B next points to language in the Fleetpro purchase orders directing BIC to coordinate the delivery of the fuel with the vessel's master through Inchcape, the local shipping agent. This instruction does not show any evidence of an agency relationship with STEM, Nova Star Cruises, or Fleetpro; the purchase order merely informed BIC who the eventual direct supplier would need to contact to facilitate the delivery.

TM&B also highlights STEM's failure to introduce additional evidence regarding the terms of the contract between Nova Star Cruises and BIC. While such evidence may have been relevant, there was other sufficient evidence presented that

BIC and Nova Star Cruises were engaged in an ordinary commercial transaction for the sale of goods, rather than an agency relationship.

Finally, TM&B invokes the Sprague fuel delivery receipts as evidence that Sprague dealt directly with the vessel, but it is unclear how such evidence would support a conclusion that BIC was an agent of anyone. Regardless, I credit DeGiulio's testimony that these receipts reflect nothing more than the vessel's acceptance of the deliveries.

Accordingly, based on the record evidence, it is more likely than not that STEM would have been able to prove in the underlying arrest proceeding that BIC was not acting as an agent of STEM, Nova Star Cruises, or Fleetpro. Thus, STEM has proven by a preponderance of the evidence that it would have prevailed in the arrest proceeding on Sprague's maritime lien claim but for TM&B's negligent advice.[5]

## III.  CONCLUSION

Based on the above findings and conclusions, it is **ORDERED** that judgment is entered in favor of Plaintiff ST Engineering Marine, Ltd. in the amount of $261,839.04. It is further **ORDERED** that STEM is awarded prejudgment interest as allowed by 14 M.R.S.A. § 1602-B (West 2022), at a rate of 3 three (3) percent above

---

[5] TM&B does not explicitly press the possibility that Sprague had a maritime lien on account of the middleman exception recognized in *Cianbro*, i.e., that a person authorized to order necessaries controlled the selection or performance of Sprague notwithstanding its subcontractor status. *See* 596 F.3d at 17. However, that idea might be fairly encompassed within TM&B's statements that "Plaintiff would need to demonstrate that Sprague did not supply [fuel] to the Nova Star at the direction of the owner, the charterer, or someone authorized by them to order the necessaries," ECF No. 68 at 18, and that STEM "has not proven what, if any, communications took place with Sprague as it relates both to BIC, to Bunkers International, and to the vessel." ECF No. 61 at 171:21-23. Still, this argument is foreclosed by my factual finding that STEM, Nova Star Cruises, and Fleetpro did not control the selection or performance of Sprague.

the "one-year Treasury Bill rate" from the last full week of the calendar year immediately prior to the year in which prejudgment interest began to accrue.  14 M.R.S.A. § 1602-B(3).  TM&B is liable for prejudgment interest accrued between September 15, 2020—the date of the filing of the Complaint—and September 30, 2022—the date on which the order of judgment was entered.  *See* 14 M.R.S.A. § 1602-B(5).

**SO ORDERED.**

**Dated:  December 12, 2022**

_____/s/ JON D. LEVY_____
**CHIEF U.S. DISTRICT JUDGE**